Good morning, Your Honors. May it please the Court, Bardus McKeeley for Plaintiff Appellant William Fitzgerald with me at Council Tables, Belinda Escobosa-Helser. I'd like to reserve two minutes for rebuttal, please. Your Honor, Your Honors, today I'd like to address this standing, the issue of Mr. Fitzgerald's standing. Although we appealed the order on summary judgment, I'd be pleased to answer any questions you have. I'll focus my presentation on the issue of Mr. Fitzgerald, who has articulated a desire to go to Orange County Board of Supervisors meetings and give harsh and abrasive personal criticism of the Board as standing to challenge their rules and guidelines that on their face state plainly that the utterance of personal and pertinent slanderous or profane remarks is prohibited. So does he want to make profane remarks? He wants to make, he has testified that he wants to make personal. Does he want to make slanderous remarks? He wants to make a harsh criticism of the Board, Your Honor. Okay. So what does he think, what provision of the order does he think he's going to violate? The restriction on pertinent and personal remarks, at least arguably for the purposes of standing, limits his ability to give harsh criticism to the Board. Has he said it's his objective to disrupt the meeting? I'm sorry, Your Honor? Has he said it's his intent for his comments to be disruptive? He specifically said it is not his intent to be disruptive of the meeting. Just offensive? Just offensive, abrasive, provocative and harsh. I didn't mean to be glib, but is that fair? That's right, Your Honor. Okay. No, I think it's important to understand what your client wants to do so we can evaluate his standing. I didn't think you'd say he wanted to make slanderous or profane remarks, so we're down to impertinent and personal. That's right. And whether that would... And he does not want to disrupt. That's right. And the question is whether that would arguably, for standing at least, whether that would arguably be restricted by the rules as they are on their face. Now, the District Court below said no, essentially because Mr. Fitzgerald hadn't been told explicitly and verbally what's already explicit in the rules, that violation of these rules can lead to silencing, removal or arrest, and that he hadn't gone and gotten himself tossed out or arrested. But that's not the law. The law on pre-enforcement First Amendment challenges clearly indicates that if you have indicated a clear intent to engage in conduct that would arguably violate the law and you've refrained from doing so, then you have standing as long as that's based on a well-founded fear of enforcement. That's on a facial basis, right? On a facial basis, yes. And I gather your client contends that he's self-censored and that gets you also past the standing issue on the facial challenge. Is that right? He says that he's self-censored and continues to. Right. He has testified explicitly and specifically about what he'd like to say. For instance, he said that at a September 6th, 2011 hearing, which immediately followed the August hearing, which appeared on the video and was subject to some of the controversy in this case, he wanted to go. He had even prepared his remarks. It was a hearing on votes to rig up gerrymandered districts to get themselves reelected. And he testified that he would do that in a harsh way, harsher even than the way he said it on August 21st. He testified that he does that harshly and abrasively because that's the way he feels gets his point across the best. Is your client still challenging the judges as applied ruling? The summary judgment order, Your Honor, he believes was based on a, that the judge didn't evaluate the facts in the light most favorable to Mr. Fitzgerald. So in other words, it's a basic summary judgment miscarriage there. That's right. But not based on the legal point, but rather that he just blew the summary judgment, right? That's right. On the facts as they were at summary judgment, a reasonable person would have believed that he was not, he or she was not free to continue to articulate his speech the way he had planned. Okay. So walk me through this. If we hold that your client has standing, then what happens next in this course of litigation? Right. So the case would then, if my client has standing and you hold that he has standing, we would ask that Mr. Fitzgerald ask that you remain the case back to the district court with instructions to rule on the factual issue of whether the Orange County Board of Supervisors employs an authoritative narrowing construction of their rules as required by the order in White v. City of Norwalk. In White v. City of Norwalk... So if they stand up today and tell us that they adopt the Norwalk standard, where does that leave you? It needs to be an authoritative binding construction that would bind future board members from interpreting the rule differently. And that's not what we have, and that's not what the evidence shows. Every year there's a new board chair authorized to interpret Rule 46 as he or she sees fit. That's what the testimony is. And the testimony of previous board chairs was that they equated personal and pertinent slanderous speech with disruptions. That's not the law. That's not the way White v. City of Norwalk says the law must be. They said that for a law like this to be constitutional, it must be construed authoritatively and narrowly to only restrict disruptive conduct, disruptive behavior. And they can't just say that they do that just to get passed, just to invoke the aid of Norwalk. Disruption means disruption. And they can't... Actual disruption, yes. In your famous words, Your Honor. So that's what would happen on remand. And I would also say that the speaker guidelines themselves are not subject to any kind of narrowing interpretation and they're subject to their own independent challenge. The speaker guidelines stop at the words, speakers shall refrain from engaging in personal and pertinent slanderous or profane remarks, period. There's no reason, there's no following, follow-up sentence that exists in Rule 46 and in the ordinance in Norwalk that would allow for this reasonable construction. So on remand, I think the instruction would have to be that the speaker guidelines are indeed unconstitutional. They cannot be, they're not reasonably susceptible to any other interpretation. Now for standing, excuse me, for standing, the first step is whether Mr. Fitzgerald has articulated a concrete plan that arguably violates the law. As I said, he has a concrete plan and it seems the arguably standard he meets there. Now if he's met that clearly enough, that's all he needs to do, Your Honor. In Wolfson v. Brammer, the court admitted that there was no past enforcement of any kind and that there were no threats of enforcement going on, but because there was such a clear plan to arguably violate the law, they found standing on a pre-enforcement theory. So that's the first inquiry. The second and third inquiries are whether there are a threat of enforcement and then the history of enforcement of this rule. And those here tip also toward a finding of standing. Those two questions actually are two sides of the same coin. They ask whether there's enforcement against Mr. Fitzgerald particularly and then enforcement against other people in the past, where the district court aired here isn't having too narrow a definition of what enforcement is. The district court relied very heavily on whether people had been removed from the boardroom or arrested. But the suppression of speech itself is enforcement of this law. This law is intended to and designed to suppress certain types of speech. And the testimony came out very clearly that when people utter personal remarks or remarks that were found offensive, the board members would ask them to refrain from doing so and that in most cases people would. That is enforcement of Rule 46 in the Speaker Guidelines. People don't need to continue to insist that they're allowed to speak. That's not what a reasonable person of ordinary firmness would do when confronted with the Orange County chair of the board, especially not when the rule allows for criminal consequences and there's an armed sheriff's deputy standing 20 feet away. So enforcement constitutes something much more than mere arrest or removal. But would an ordinary person, a reasonable person of ordinary firmness feel that they had to modify their First Amendment behavior based on what's happened? And that's been met here. Relevantly, in terms of the second inquiry, the specific threat, the Ninth Circuit has found that there doesn't even need to be independent contact between the defendant and the plaintiffs in the Libertarian Party of L.A. v. Bowen. The plaintiffs challenged a law that required circulators to reside in a particular area. The plaintiffs said we want mere circulators and we're candidates and we want to hire circulators from out of our district to circulate within there. And the court said, okay, you have a concrete plan. And with regard to threats, the Secretary of State here has not only the law in effect, but has issued on her website guidelines, instructions for how to go about becoming a candidate for office. And in those guidelines, the Secretary of State repeated the rule and the court found that that was enough. That was an affirmative step beyond the mere existence of the statute. It conveyed a significant threat of enforcement. And what we have here is virtually the same thing. You have speaker guidelines that are published on the board's website. And they say that without any modification in absolute terms, speakers must refrain from engaging in personal and pertinent slanders or profane remarks. That is a step that goes beyond enforcement that conveys a threat. On top of that, the defendant's actions on those days was enough to convey at least a threat that some enforcement might take place. Although there's debate about what was said and what was meant when Defendant Pena approached Mr. Fitzgerald, the facts that are undisputed are that Mr. Fitzgerald said some offensive things and pretty quickly thereafter was interrupted. Interruptions don't commonly occur. That was the testimony of the Orange County Board of Supervisors. And a police officer armed came over and asked him to stand down, heed my words. Those are Officer Pena's words. Officer Pena was more courteous when I said that. He testified, Pena did, that he did that after exchanging a glance with Defendant Moorlach, who was the chair of the Board of Supervisors. Counselor, could I ask, right there in the chronology, does the record show us how far away the officer stood when he approached and made those comments to stand down? So the record reflects that in trial it came out that from the podium the officer stands maybe 20, I believe it was 30 feet away from, that's where his position is. But then he approached. Then he approaches and they were face to face. You can see it in the video when they testified. They were essentially face to face. Is that when, when they were face to face in the video, is that when those comments were made? The comments were made immediately preceding that. So that's farther away. I'm sorry, I didn't mean to interrupt, but your comments, your question, those comments, the heed my words, that was said right there face to face. Thank you. The stand down and heed my words was said face to face. And then Defendant Pena went back and then there was, at least with the July incident, there was more conversation and Defendant Pena came over again. At that point, Mr. Fitzgerald left with Officer Pena 10 feet behind him. That's the court's factual finding. He was no longer 30 feet. And there was a second officer that had come in the room that also followed him out. That was also a factual finding or an uncontroverted testimony. On the later incident, the August incident, Mr. Fitzgerald said his provocative comments and was immediately interrupted again. And while the Defendant Wynn was telling him that his speech was inappropriate and appalling, I think she said appalling and wrong, at that same time, Defendant Pena was having the same conversation with him, saying stand down. And Mr. Fitzgerald left. Now, the court said he left voluntarily, but that's a very broad interpretation of voluntarily as well, Your Honor. In Bantam Books, the Supreme Court case where Rhode Island Morality Commission went around sending letters to book distributors saying thank you for cooperation. We find these books offensive. The booksellers stopped distributing the books and the court said, well, that's not really voluntarily. They didn't want to test the law. That's not a voluntary, it says cooperation, but they didn't voluntarily stop distributing the books. They self-censored. And so this falls along those lines. Mr. Fitzgerald left because he didn't want to test what was going on there. With that, I reserve the rest of my remaining time. Very good. Thank you. Thank you, Your Honors. We'll hear from the county. Good morning, Your Honors. Wendy Phillips, Deputy County Counsel, appearing on behalf of the Defendant's Appellees in this matter, the County of Orange and the individually named defendants. Mr. Fitzgerald's counsel focused on the standing question, so I will do the same. And answer any questions you may have with regard to the summary judgment issues. With regard to standing, we propose that the lower court properly found that Mr. Fitzgerald lacks standing. This case and the facts surrounding Mr. Fitzgerald's two appearances at the board meeting simply are not the stuff that First Amendment violations are made of. So he says he wants to be impertinent and personal. Correct. He's got a plan. Why isn't that enough? Because under the Lopez v. Candinelli case, which we suggest is very instructive on analyzing standing in pre-enforcement First Amendment cases, a panel of this court went through a very extensive analysis of when is it proper to find that pre-enforcement standing exists. And in that case, despite the fact that the court found the facts of the Lopez case very the professor in that case called the student a fascist bastard for his speech, threatened him with expulsion, specifically referenced the code of conduct, which was the policy that was at issue in the Lopez case. Despite all of those facts, those facts were not sufficient to establish standing according to the Lopez case, and the reason being is because the other elements were not present. There was no specific threat of enforcement. For standing in a pre-enforcement case, it has to be a specific threat of enforcement. In this appeal, petitioners are relying upon implied invocations of Rule 46, but the Lopez case also tells us that implied invocations are simply not enough. And other cases also talk to the fact that it has to be specific invocations of the rules. Switching for a moment to the question of self- I don't understand how that jibes with what the county did here. This is available, I think, on its website, and also there's a brochure or something. So how is that, why does that miss the mark? Why isn't that good enough? I'm sorry, why is what not good enough? Why is the county's explanation of its rule not specific enough? Because it's merely a recitation of the rule. It is merely a proscriptive statute, and the courts have said, especially in a self-censorship standing basis, and in pre-enforcement, a simple proscriptive statute is not enough. So what more would they need to do? There has to be an actual threat or fear of enforcement of that statute, number one. Would one of the Board of Supervisors have to say, stop, or we're going to have you taken out? Do you mean specific as to this individual, or can you help me out with this part of your- Yes. I find this troubling. Yes, I believe so. And although, I don't want to get mixed up with the self-censorship, because there is a slightly different standard there. So keeping this with the credible threat of enforcement question, the credible threat of enforcement question, all of the authorities discuss some actual threat of enforcement of the challenged rule from someone in authority to enforce that rule. So for instance, in the Stefel v. Thomas case, which is a United States Supreme Court case, a police officer approached people who were handing out handbills at a mall and told these people, you're violating the law, you have to stop doing this. If you do not stop doing this, you will be arrested. That was found sufficient. Compare that to the Younger v. Harris case. In Younger v. Harris, one of the plaintiffs was found to have standing because they were actually arrested for violating the sedition laws. And the other three, though, only expressed an inhibition because of the rule. No statement had been made to those particular defendants that your activities may in fact violate this law. So why isn't stand down, heed my words, why isn't that good enough? What more would have had to happen? Because first of all, the Sergeant of Arms is just attempting to get Mr. Fitzgerald to come into decorum, which in White v. Norwalk, this court has indicated there is no violation of the First Amendment for a limited public forum to have a rule whereby people have to abide by certain decorum. And in this instance, Mr. Fitzgerald was interrupting the chairman of the board, was talking over other members of the board. In the situation when Supervisor Wynn was the chair, she specifically said, I yield the floor to Mr. Moorlach, Mr. Fitzgerald, please let Mr. Moorlach speak. Supervisor Campbell also said to him, you will get your full time. And I think that the second event in particular. So all that means, he's breaking the rules. Right. Okay. And so I'm looking for the specific threat. What would have happened, had to happen for there to be a specific threat of enforcement? Well, the fact that Supervisor Campbell on the second incident said, you will get your full time, argues against that the rule is going to be enforced. Because the enforcement of Rule 46 is removal from the meeting, not being allowed to speak at future meetings, or potentially arrest if it's sworn out for an arrest or prosecution. So you really think that if he comes in before the board and accuses them of illegal vote trading, he's not going to get tossed? I really do think that. Because unlike the... But there's a guy with a gun approaching the room. Well, no, really. I mean, I think the specific setting is important. And so that's why I asked, and I think that is the record. He was 20 or 30 feet away. He approached. Correct. That's powerful. Yeah. The problem here is that with the credible threat of enforcement, the person themselves has to legitimately believe, have a reasonable belief, and a reasonable person in their position would also believe. Mr. Fitzgerald's testimony actually is against the idea that he reasonably believed that this rule was going to be enforced against him for several reasons. First of all, he testified at his deposition in April, which was four months after the last incident occurred, that he didn't even think Rule 46 applied against him. So how could he be fearful that it would be applied against him to have him arrested? He characterized Deputy Pena's interactions with him as very professional. The only time that Deputy Pena followed him out, and there was conversation off the record, if you will, outside the view of the video, was the first meeting. If Mr. Fitzgerald really was concerned, had a personal, reasonable concern that this law was, rule was going to be enforced against him, why did he return to at least two more meetings? The record reflects at least two more meetings. So let me ask, to understand the point of your argument, but let me ask a practical question. I mean, you've read Norwalk. You've read Norse. I assume you take those teachings that it requires an actual disturbance, true? So it doesn't seem like you're very far apart in this case, in terms of actually resolving the real controversy, which is, he says, he doesn't think you're going to adhere to Norwalk. That's what he says he thinks, but the testimony of all the witnesses at the trial and the are that, in fact, that is not a legitimate concern of Mr. Fitzgerald. Well, yes, but I understand that, but I mean, in terms of what counsel is saying today, in terms of their concern, they say, well, we don't have a declaration from the city that you're going to actually impose the actual disturbance floor to enforcement of these rules. And I gather from what you've said in your briefs, you would agree to that on behalf of the city today, true? Yes, I would. And in fact, the testimony of the individual board members was that if a question came up about potentially having someone removed, they would defer to county counsel and ask that question. So how do we resolve this controversy so we don't send this case back and he gets tossed and we come back again and you say, well, here's this assurance. If all it takes is the assurance in a legally enforceable way that you're going to follow the law, why can't we settle this today? Because we don't think there's an actual controversy because he doesn't have standing under Article 3. He says that the record shows that each year, whoever is chair of the Board of Supervisors gets to interpret this rule as he or she sees fit, which is different than I'm understanding your answer to Judge Thomas. Well, to the extent that there is no written interpretation of the rule, because we think the rule stands for itself, and from the beginning of this litigation, we have asserted that we interpret it like white. We adopted the rule after white. We adopted a rule to be identical to white so that we would be in compliance with what this court has said is constitutional for purposes of a limited public forum. Right. I mean, what I take from you is you've done your job professionally. Of course, what the council members do is entirely, as you know, outside your control. But it just strikes me that one of two things is going to happen here. Either we say there's no standing, and then he goes back, and he's disruptive, and he gets tossed, and he comes back here, or we say he has standing, and Judge Selma then has to say, well, you have to follow the case law of the Ninth Circuit. And either way, you end up, I think, following the case law. So it strikes me this is entirely settleable controversy. Potentially. But at this point in time, the question is one of standing, as is presented to the court, and whether or not the grant of summary judgment is appropriate. But this whole thing becomes moot if this representation is made, isn't it? In agreement that Norwalk will be followed? We don't think so, because we've made the representation from day one when the case was filed. In response to the TRO, we made the representation. They argue that there needed to be a construction of the rule that was constitutional in advance of litigation, and it can't just be a litigation position. That's not true. In fact, in the Acosta v. Costa Mesa case, this court conducted its own analysis of the rule that was at issue there, and the city attorney, during litigation, and even at the court of appeal, offered three variable interpretations of the ordinance that they put forward as reasonable. And so I think that the problem is the question of standing. We just have to – we can't just let go of the question of standing. I'm not letting go of it, but if we rule against you on standing, then the question is, then what? And I gather you wouldn't object us to write an opinion saying, reaching the merits of the facial challenge, saying the city, as in Norwalk, that the city has said that actual disruption is required, and that's the end of it. True? Yes. And we anticipated that could happen. Rather than remanding it to Judge Selma to have him consider that in the first instance. Is that your representation? That the city will not – I mean, the county will not enforce Rule 46 against Mr. Fitzgerald except in the case of an actual disruption? That is my representation based on the testimony of the board members at trial. And I don't want to put you on the spot. I mean, if you're not – if you're not authorized to make the representation, I don't want to force you into that. I think that's improper for us. But if you are prepared, then we can accept it. Okay. Okay. All right. Good. Go ahead. I have a couple questions on that issue. No, go ahead. Okay. If I could turn short – briefly to the self-censorship basis for standing. He claims that he self-censored and didn't return to future meetings. There are two themes that are clear in the self-censorship cases that have been issued. One is that there has to be a well-founded fear that the prescriptive statute will actually – or rule will actually be applied against the individual. And secondarily, there has – the proposed conduct has to fall unambiguously – and that's the word used in Wolfson v. Brammer – that the conduct has to fall unambiguously in the prescription of the rule. Mr. Fitzgerald identifies a single sentence of a rule that is over 100 words long and focuses in on the prescriptive part of that that says you shall refrain from certain speech. But this court, of course, in White v. Norwalk, indicated that because the rule is then modified by where such speech becomes actually disruptive, then the rule on the facial basis, that is how that rule should be read. And so Wolfson v. Brammer tells us in a self-censorship case, you necessarily have to look at the not to determine if it's constitutional, not to determine the merits of the facial challenge, but to determine if looking at the plain language of the rule is what Mr. Fitzgerald is proposing violative of that rule. And this touches upon what Judge Christin was saying about the fact that does he plan to be disruptive? And he explicitly stated in testimony he doesn't plan to be disruptive and that, I think, quote, a speaker should never do that. And so he doesn't intend to violate the rule. And so with regard to... I think disruptive is in the eye of the beholder, really. I mean, he thinks he's not being disruptive, but I think some of the council members expect, think he is disruptive. I mean, it is as intent as his strategy that he thinks is effective as to be very provocative. That's true. But I would say that... It doesn't seem to be a successful strategy, but that's a strategy. That does beg the question. But that's his view. That's the plan, right? To go in and... And that's classic First Amendment. Right. Right. But from the perspective of the council members, I would disagree that they think that what he has done in the past is disruptive because they didn't have him removed. They didn't tell him he couldn't finish his speech. On the second occasion, they explicitly told him, you will get your full time. On the second occasion, Supervisor Wynn said, come in here and criticize me all you want. She didn't like the fact that he was criticizing her constituency who was also present in that meeting. Right. And so she was exercising her First Amendment right to defend her constituency. And because he didn't like being interrupted and not being allowed to speak for three minutes uninterrupted, which is not a constitutional right, then he turned and left the meeting room. The same thing happened the first time. There was no reasonable fear of enforcement of Rule 46 that was expressed by evidence below. And we would ask that the court find accordingly and affirm the findings on standing and also affirm the grants of summary judgment. Let me ask you one other practical question. Leaving Mr. Fitzgerald aside, is this, and I have to ask you to go outside the record, but I'm just curious, is this a big issue in the County of Orange? No, it's not. And I can tell you that according to the record, except for once in 20 years of Darlene Bloom's testimony, she doesn't recall anybody ever being removed. Very good. Thank you. Thank you. You have two minutes for rebuttal. She doesn't remember anyone ever being removed. She remembers plenty of people being silenced, and that's an important point. This really, going to the merits issue that you all, I'm sorry, that your honors are discussing regarding the construction, this is really about having an authoritative construction, something that binds future board members so that they can't interpret it any way they see fit. County Council has done her job well, but you're right that the board members themselves repeatedly testified that they equate impolite and discourteous speech with disruption, that they equate the two. And that's what happens a lot out of the holding of White v. Norwalk. It's misinterpreted by the people on the ground quite often to say that this kind of rule stands because impersonal, pertinent slanders or profane remarks are disruptive, and that's not what White says. White says, White essentially reads that language out and says disruption. And that's where a lot of this conflict comes from. We said that expressly in Norris, because that was the same argument, that violation of the rules would constitute a disruption. That's right. And what we're asking for is a binding, an authoritative binding construction that would bind future board members. In fact, Supervisor Warlock testified repeatedly that he expects courtesy and he wouldn't be able to enforce Rule 46 in the future. Wouldn't be what? Wouldn't be what? He said, he was asked, would you enforce Rule 46 in the future, and he said, now that I know a lot more about it, I could, I certainly could, is what he said. This distinction between unambiguous versus arguable, Wolfson, Calprolite v. Getman, American bookseller, Virginia v. American bookseller, Steele Co., they all have the same standard arguable. In Steele Co., the Supreme Court said the district court has jurisdiction if the plaintiff will succeed on the merits if the law is given one construction, and he'll lose if the law is given another. Right? This is arguable. In American booksellers, the argument was made that the defendants there misunderstood and misinterpreted the law in its reach, and the court said, they have, the booksellers have standing because if their argument is correct, they have to go into compliance with the law. So the issue is about whether it's arguable, and if you have a concrete plan to engage in conduct that arguably violates the law, in the pre-enforcement context, that's But that's all in an as-applied context, right? That actually, Your Honor, is part of the facial, is in the facial challenge. If you have a concrete plan to engage in conduct that might violate the law as it applies to you, I think is what, then you have standing to make the facial challenge. I guess we're trains passing in the night, because what I thought we were talking about is, in the event this court followed the hypothetical that my colleague suggested, which is, we find standing, we take what counsel has said based upon these statements of the county supervisors that, in effect, they intend to comply with white, and we send it back. That's the end of the facial case, realistically. If you come back, Mr. Fitzgerald does whatever, then you've got an as-applied challenge, and that's what I was talking about. Do you agree with that? So, I just want to repeat a little bit to make sure that we're talking, we're not ships passing the night, but if this court were to say that they were required to comply with white, that would end the facial challenge, because that would be a binding decision that would bind future council members from exercising their own discretion on this issue. Well, they're required to do that whether they agree to it or not, right? They, so, if this was a federal court, if this was a federal... This is a federal court. Now, if you didn't know that, counsel, we've got a lot of problems. If this was a federal law in a federal agency, they might be found to be, it might be something where we could bring them back and say they're actually in violation of white, but this is a local agency charged with interpreting its own rules. Unfortunately, the federal court can't interpret local rules for them. They need to interpret it themselves, and if they choose to ignore white, that creates a problem for us. As far as I know, though, the First Amendment is a federal constitutional issue, right? Right. And white interprets the application of the First Amendment to these meetings, right? That's correct. And that's what we're talking about here, too, right? But what the federal court, unfortunately, can't do is interpret Rule 46 to save it on behalf of the county. The county actually, the supervisors actually have to interpret it authoritatively correctly, not just every year that you get a nice supervisor. Well, why not in this sense? I mean, and I'm not sure. Obviously, the issue is in front of us, but that's one of the reasons we have oral argument is to kind of explore things. I mean, if we accepted representation of counsel and said that's their construction, why isn't it just like Norwalk? Because, well, that construction isn't really supported by the evidence in the Recuron. The speaker guidelines are the only interpretation. I'm sorry? You don't want to win? No, I mean, I don't know if we reached this or not. We haven't talked about this case. Obviously, we're just exploring different avenues, but I mean, I guess your position is we can't accept the representation of counsel. I do want to win, Your Honor. Let's be clear about that. I mean, that's your ultimate aim here is to try to at least cabin this in some fashion or maybe I'm misinterpreting. Really, the ultimate aim, Your Honor, is that people like Mr. Fitzgerald and people like him know that when they go to the Board of Supervisors meetings, they can say personal and pertinent, slanderous, or profane things if it's within the jurisdiction of the Board. I don't think we're going to do slanderous or profane. Well, you can say pertinent, personal, and abrasive, harsh things to the Board. But you can get into other areas, and that's entirely different. That's right. I take that terminology together to mean that criticism, harsh criticism, is restricted. You couldn't be personal and pertinent, slanderous or profane, and be admiring who you're talking to. It's a viewpoint type of thing. It's hard to imagine someone being impertinent who's praising the Board, but someone being impertinent could only be really criticizing the Board. You're drawing one line, and they may well draw another line in saying, look, we are entitled to enforce decorum rules that say you can't slander and you can't use profane language. So this is an important distinction, at least for my vote. Could you please clarify? The rule, I mean, this is a... You started a sentence that said you want speakers to know that they can go forward and go to the podium. That's right. I want them to know that they can go... And be able to do what? Yeah, that they can go offer criticism to the Board, even harsh, impolite, and discourteous criticism, without fear of being silenced, removed, or arrested. Well, basically, as you know, in White, I'm quoting here, in dealing with the agenda items, the Council does not violate the First Amendment when it restricts public speakers to the subject in hand. So Mr. Fitzgerald, whether he likes it or not, can be restricted to the subject at hand. In addition to that, while the speaker may not be stopped from speaking because the moderator disagrees with the viewpoint he's expressing, it certainly may stop him if his speech becomes irrelevant or repetitious. That's right. So he's certainly bound by those requirements. That's pretty clear under White. Right? And there are other cases that deal with that as well. So our case law, and certainly the Supreme Court case law, fills in most of the blanks that you would have in this situation. Obviously, the future is the future. But Mr. Fitzgerald is not entitled to just run away with the meeting and say whatever he wants and talk about whatever he wants, right? That's correct. The restriction has to be viewpoint neutral and reasonable in light of the purpose of the meeting. Right. Well, they're very interesting questions presented by this case. Standing rightness and all the other issues that weren't discussed today. So we appreciate your arguments and your briefing. And the case will be under submission for decision.
judges: Thomas, Smith, Christen